IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED

2005 JUN -3 P 4: 03

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | | |
|---|---|---|
| THELMA BARNES, BERNICE ADAMS | ) | |
| DAVID ALEXANDER, ELIZABETH | ) | |
| ALEXANDER, LANETTA ALEXANDER | ) | |
| ARELEAN ALLEN, HELEN ALLEN, AND | ) | |
| OTHER PLAINTIFFS IDENTIFED IN | ) | |
| EXHIBIT "A" ATTACHED HERETO AND | ) | |
| INCORPORATED FULLY HEREIN | ) | |
| | ) | |
| **Plaintiffs,** | ) | CIVIL ACTION NO.: |
| | ) | 2:05 cv 530-T |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | **(JURY DEMAND)** |
| LIBERTY NATIONAL LIFE | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| | ) | |
| **Defendant,** | ) | |

## COMPLAINT

Plaintiffs bring this action against Liberty National Life Insurance Company, and pursuant to their investigation, upon knowledge as to themselves and their own acts and otherwise upon information and belief, for their Complaint allege as follows:

### I. JURISDICTIONAL ALLEGATIONS

1. Plaintiff Thelma Barnes is a citizen of the State of Alabama.

2. Plaintiff Bernice Adams is a citizen of the State of Alabama.

3. Plaintiff David Alexander is a citizen of the State of Alabama.

4. Plaintiff Elizabeth Alexander is a citizen of the State of Alabama.

5. Plaintiff Lanetta Alexander is a citizen of the State of Alabama.

6. Plaintiff Arlean Allen is a citizen of the State of Alabama.

7.    Plaintiff Helen Allen is a citizen of the State of Alabama.

8.    Plaintiff Robert Allen is a citizen of the State of Alabama.

9.    Plaintiff Robert L. Allen is a citizen of the State of Alabama.

10.   Plaintiff Sarah Allen is a citizen of the State of Alabama.

11.   Plaintiff Mary Allums is a citizen of the State of Alabama.

12.   Plaintiff Lois Alvies is a citizen of the State of Alabama.

13.   Plaintiff Mae Alvies is a citizen of the State of Alabama.

14.   Plaintiff Alberta Anderson is a citizen of the State of Alabama.

15.   Plaintiff Clemia Anderson is a citizen of the State of Alabama.

16.   Plaintiff David Anderson is a citizen of the State of Alabama.

17.   Plaintiff H.V. Anderson, Jr. is a citizen of the State of Alabama.

18.   Plaintiff Percy Andrews is a citizen of the State of Alabama.

19.   Plaintiff Catherine Armbrester is a citizen of the State of Alabama.

20.   Plaintiff Ada Askew is a citizen of the State of Georgia.

21.   Plaintiff Catherine Austin is a citizen of the State of Alabama.

22.   Plaintiff Eddie Ayers is a citizen of the State of Alabama.

23.   Plaintiff Bettye Bailey is a citizen of the State of Alabama.

24.   Plaintiff Harrison Bailey, Jr. is a citizen of the State of Alabama.

25.   Plaintiff Willie Baker is a citizen of the State of Alabama.

26.   Plaintiff Roberta Baldwin is a citizen of the State of Alabama.

27.   Plaintiff Bessie Ball is a citizen of the State of Alabama.

28.   Plaintiff Inell Banks is a citizen of the State of Alabama.

29.   Plaintiff Herbert Barber is a citizen of the State of Alabama.

30.    Plaintiff Alice Barley is a citizen of the State of Alabama.

31.    Plaintiff Mealie Barlow is a citizen of the State of Alabama.

32.    Plaintiff Ethel Barrow is a citizen of the State of Alabama.

33.    Plaintiff Fred Bass is a citizen of the State of Alabama.

34.    Plaintiff Annie Bates is a citizen of the State of Alabama.

35.    Plaintiff Susie Bates is a citizen of the State of Alabama.

36.    Plaintiff Laura Beavers is a citizen of the State of Alabama.

37.    Plaintiff Gracie Bell is a citizen of the State of Alabama.

38.    Plaintiff Mary Bell is a citizen of the State of Alabama.

39.    Plaintiff Emma Belser is a citizen of the State of Alabama.

40.    Plaintiff George Belyeu is a citizen of the State of Alabama.

41.    Plaintiff Lendia Belyeu is a citizen of the State of Alabama.

42.    Plaintiff Leshia Belyeu is a citizen of the State of Alabama.

43.    Plaintiff Lettie Belyeu is a citizen of the State of Alabama.

44.    Plaintiff Margaret Bennett is a citizen of the State of Alabama.

45.    Plaintiff Mary Benson is a citizen of the State of Alabama.

46.    Plaintiff Virginia Benson is a citizen of the State of Alabama.

47.    Plaintiff Patricia Beville is a citizen of the State of Alabama.

48.    Plaintiff Tom and Eddie Beville are citizens of the State of Alabama.

49.    Plaintiff Anthony Bibbs is a citizen of the State of Alabama.

50.    Plaintiff Annie Billingsley is a citizen of the State of Alabama.

51.    Plaintiff Thelma Bishop is a citizen of the State of Alabama.

52.    Plaintiff Mary Bizzell is a citizen of the State of Alabama.

53.    Plaintiff Cleveland Black is a citizen of the State of Alabama.

54.    Plaintiff Deloris Blanding is a citizen of the State of Alabama.

55.    Plaintiff Willie Blevins is a citizen of the State of Alabama.

56.    Plaintiff Annie Teresa Blunt is a citizen of the State of Alabama.

57.    Plaintiff Jerry Bond is a citizen of the State of Alabama.

58.    Plaintiff Ethel Borders is a citizen of the State of Alabama.

59.    Plaintiff Catherine Boyd is a citizen of the State of Alabama.

60.    Plaintiff Elvira Boykin is a citizen of the State of Alabama.

61.    Plaintiff Randy Bradford is a citizen of the State of Georgia.

62.    Plaintiff Geraldine Braxton is a citizen of the State of Alabama.

63.    Plaintiff Charles Brooks is a citizen of the State of Alabama.

64.    Plaintiff Eugene Brooks is a citizen of the State of Alabama.

65.    Plaintiff Richard Brooks is a citizen of the State of Alabama.

66.    Plaintiff Cindy Brothers is a citizen of the State of Alabama.

67.    Plaintiff Herman Brown is a citizen of the State of Alabama.

68.    Plaintiff Lucida Brown is a citizen of the State of Alabama.

69.    Plaintiff Mary Brown is a citizen of the State of Alabama.

70.    Plaintiff Rosa Brown is a citizen of the State of Alabama.

71.    Plaintiff Louise Brunson is a citizen of the State of Alabama.

72.    Plaintiff Tiny Burns is a citizen of the State of Alabama.

73.    Plaintiff Julia Burrow is a citizen of the State of Alabama.

74.    Plaintiff Lera Burton is a citizen of the State of Alabama.

75.    Plaintiff Willie Burts is a citizen of the State of Alabama.

76.    Plaintiff Wilhelmina Bush-Norris is a citizen of the State of Alabama.

77.    Plaintiff Emma Buycks is a citizen of the State of Alabama.

78.    Plaintiff Carl Byers is a citizen of the State of Alabama.

79.    Plaintiff Debra Byrd is a citizen of the State of Alabama.

80.    Planitff Ida Byrd is a citizen of the State of Alabama.

81.    Plaintiff Jeffery Byrd is a citizen of the State of Alabama.

82.    Plaintiff Joseph Byrd is a citizen of the State of Alabama.

83.    Plaintiff Marion Byrd is a citizen of the State of Alabama.

84.    Plaintiff Vanessa Byrd is a citizen of the State of Alabama.

85.    Plaintiff Annie Caldwell is a citizen of the State of Alabama.

86.    Plaintiff Dorothy Campbell is a citizen of the State of Alabama.

87.    Plaintiff Edward Campbell is a citizen of the State of Alabama.

88.    Plaintiff Leon Campbell is a citizen of the State of Alabama.

89.    Plaintiff Sarah Campbell is a citizen of the State of Alabama.

90.    Plaintiff Shirley Campbell is a citizen of the State of Alabama.

91.    Plaintiff Steve Caraway is a citizen of the State of Alabama.

92.    Plaintiff Verlener Cargill is a citizen of the State of Alabama.

93.    Plaintiff Lola Carmichael is a citizen of the State of Alabama.

94.    Plaintiff William Carroll is a citizen of the State of Alabama.

95.    Plaintiff Sarah Carter is a citizen of the State of Alabama.

96.    Plaintiff Virginia Carter is a citizen of the State of Alabama.

97.    Plaintiff Martha Chambliss is a citizen of the State of Alabama.

98.    Plaintiff Annie Chapman is a citizen of the State of Alabama.

99.   Plaintiff Edith Chisholm is a citizen of the State of Alabama.

100.   Plaintiff Nelson Christian is a citizen of the State of Alabama.

101.   Defendant Liberty National Life Insurance Company is an Alabama corporation. Liberty National Life Insurance Company and several life insurance companies owned by Liberty National Life Insurance Company sold a substantial number of industrial insurance products, including, but not exclusive of, life insurance, burial insurance, and health and accident insurance. Service Insurance Company of Alabama ("Service"), was a wholly owned subsidiary of Liberty National Life Insurance Company, which has been merged into Liberty National Life Insurance Company. Liberty National Life Insurance Company is responsible for and has assumed the liabilities of Service. Prior to the merger referred to above, Service was operated by and controlled by Liberty National Life Insurance Company for the purpose of issuing insurance products to African-Americans. At all times Liberty National Life Insurance Company has controlled Service in all respects including, but not limited to, the establishment of premium rates and Policy administration, and insurance policies and procedures. Liberty National Life Insurance Company and Service are hereinafter collectively referred to as "Liberty National" in the Complaint.

102.   A substantial number of events, omissions and conduct which give rise to the Plaintiffs' claims took place in Alabama.

103.   Because Liberty National conducts business in this district and because a substantial part of the events, omissions and conduct giving rise to the claim occurred in the district, venue is proper in this district and this division. Federal jurisdiction exists pursuant to 28 U.S.C. §1331 as to Plaintiffs' claim of race

discrimination in violation of 42 U.S.C. §1981 and §1982. The Court has supplemental jurisdiction of all remaining claims pursuant to §1367.

## II. NATURE OF THE CASE

104.    The Plaintiffs bring this action seeking redress for a scheme and pattern and practice of conduct involving racial discrimination, fraudulent concealment, unconscionable conduct and breach of contract by Liberty National relating to the marketing, sale and administration of so-called "industrial life" insurance policies. As used in the Complaint, the terms "Policies," "Industrial Policies," "Industrial Insurance" and "Industrial Life Insurance" refer to industrial life health products, including, but not limited to, life insurance, burial insurance and health and accident insurance marketed, sold, or administered by Liberty National. In addition, as set forth in this complaint, the terms "Policies," "Industrial Policies," "Industrial Insurance" and "Industrial Life Insurance" also refer to Monthly Debit Ordinary policies and all other life insurance policies where race-based pricing was used.

105.    Plaintiffs seek injunction and equitable relief, compensatory damages, punitive damages and other remedies for Liberty National's unlawful, unconscionable and racially discriminatory conduct described herein in connection with the training of its agents and the sale and administration of Industrial Life Insurance Policies to the Plaintiffs.

106.    For more than fifty years, Liberty National has maintained a discriminatory and unconscionable scheme in order to increase its own revenues and profitability to the detriment of its insureds, by implementing uniformly misleading, deceptive, unconscionable, and racially discriminatory sales and Policy administration

7

practices. Liberty National instituted these practices in order to compete with other insurance companies offering similar types of Policies.

107.    Industrial Life Insurance is a life insurance product with relatively low face value which is typically, although not always, less than $2,000, and premium payments which are intentionally designed to appear to the policyholder to be modest premium payments. These premium payments have been historically collected on a weekly or monthly basis by Liberty National sales agents.

108.    As part of its nationwide scheme, Liberty National targeted low income, impoverished, unsophisticated and minority segments of the population and marketed the Industrial Life Insurance product for sale to these consumers. In addition, on information and belief, for many years, Liberty National routinely, knowingly and intentionally caused Service to charge African-American individuals more for these Policies than Liberty National charged similarly situated Caucasian individuals. On information and belief, to the extent this discriminatory practice changed, African-Americans who purchased Industrial Policies before this discriminatory practice changed, continued to pay the same premiums which had been established under Liberty National's discriminatory pricing system. Liberty National also, as part of its routine practice and procedures, prohibited its agents from selling ordinary life insurance policies to African-Americans. Liberty National was motivated by discriminatory interest and continues to discriminate against African-Americans in the manner set forth below.

109.    Liberty National constructed the Industrial Policies with small face value and charged weekly or monthly premiums often under $1.00. Liberty National has intentionally marketed these Policies through agents who are given exclusive territories,

8

known as "debit routes." To effectuate the sale and administration of the Industrial Policies on a "debit" basis, Liberty National agents have been trained to personally visit the homes of the insured's residing on their routes to collect the premiums and develop a personal relationship with the insureds that would facilitate the sale of additional Policies. Liberty National has trained its agents to market and sell certain of these Policies as "burial" protection to manipulate the emotions of prospective policyholders by instilling in, or playing to, a sense of shame in leaving their loved ones without funds to pay for a funeral at the time of their death. The Plaintiffs were a target of this conduct.

110.    In designing, developing, marketing and selling these Policies, at all times Liberty National has known that it targeted a disadvantaged segment of the population which was unsophisticated with respect to insurance and related financial dealings or affairs and ill-equipped to understand the unfamiliar and technical language of the Policies, or the complex and sophisticated methods of determining premium payments. Liberty National has also known that the premiums appear small and affordable to the Plaintiffs, and that at the same time of purchase the benefits totaled more than these disadvantaged individuals could conceive of saving in their lifetime. Liberty National has known but has intentionally concealed from the Plaintiffs, what the targeted, unsophisticated Plaintiffs did *not* know with respect to certain Policies, that the small premiums would far exceed the value of the Policies during the Plaintiffs' lifetime.

111.    Liberty National designed the Industrial Polices to create the illusion that the policies would provide valuable yet affordable benefits. In reality, the policies are unconscionable products which were calculated to generate tremendous profits for Liberty National with little attendant risk to Liberty National and little or no economic

9

benefit for the unsuspecting and vulnerable Plaintiffs. At the same time, although the premiums appeared small and affordable, the premiums are exorbitant in relation to the minimal benefits actually provided to the Plaintiffs. Further, Liberty National has known that, in the event of lapse for nonpayment of premium, Liberty National's practice is to conceal any cash value from its policyholders and to use any cash value to pay premiums until any and all value of the Policy is completely depleted.

112.    Given the design features of the Industrial Policies, Liberty National has known that virtually no transfer of risk to Liberty National has taken place. Liberty National also has known that to the extent that any risk was transferred, it was *de minimis* and would quickly dissipate over the life of the Policies. As Liberty National expected, the Company's profits have continued to expand and the *de minimis* risk, if any, has been quickly eliminated.

113.    Liberty National has trained, allowed or encouraged its agents to routinely sell Industrial Life Insurance products to the Plaintiffs when the Plaintiffs' best interest would not have been served, assuming a life insurance need existed, by traditional ordinary life insurance of similar face amounts.

114.    Liberty National has trained, directed and knowingly allowed its agents to sell multiple Policies where policyholders had no need for the insurance and where multiple Industrial Policies were used to reach a cumulative total of face amount which, in the best interest of the Plaintiffs, could have been achieved through the use of ordinary policies of comparable value. Liberty National has had knowledge when multiple sales occurred through its establishment home office insurance procedures. Nevertheless,

10

Liberty National has maintained this practice because of the excessive profitability of the Industrial Life Insurance products.

115.    Consistent with its effort to increase profits, Liberty National has knowingly and intentionally set out to cut the administration costs associated with Industrial Policies even when doing so worked to the detriment of its African-American policyholders. Liberty National issued Industrial Policies which had, for many years, been serviced by agents on weekly debit routes. In furtherance of its plan to increase its profits and decrease its costs at the expense of African-American policyholders, Liberty National has terminated or modified the practice of weekly premium collection by debit agents throughout the country on in-force Industrial Life Policies. Liberty National has not reduced premium payments even though the costs associated with the weekly debit system were expense loaded into the premium at the time of Policy issuance and therefore has been unjustly enriched by this practice. This practice of weekly premium collection by agents was part of the course of dealing between the African-American policyholders and Liberty National.

116.    Liberty National's plan, scheme and nationwide common course of conduct was designed to and did induce thousands of existing and prospective African-American policy owners, including the Plaintiffs, to purchase Industrial Life Insurance Policies from Liberty National. The Plaintiffs have lost and/or face premiums paid in excess of the face value of the Policies or which exceed a reasonable or appropriate total of premiums which should have been paid for their Policies.

117.    The sales practices described herein have been successful for Liberty National. Liberty National has received millions of dollars of premium income on the Policies including millions of dollars of premiums which cumulatively exceed the reasonable or appropriate total of premiums which should have been paid for the Industrial Policies.

118.    Insurance premiums constitute the consideration paid to an insurer for the issuance and delivery of a policy of insurance. Insurance premiums are determined by multiplication of the rate (or unit charge) to the measure of exposure or amount of insurance provided in an insurance policy.

119.    Rate-making is the process of establishing rates used in insurance to estimate the future costs associated with the transfer of risk. Insurance rates are established by actuaries employed by insurance companies, including Liberty National. Actuaries hold themselves out, and are held out by their employers, to be professionals charged with the duty to act in the public interest. The American Academy of Actuaries has adopted Actuarial Standards of Practice provides that Actuaries are expected to provide counsel which is not only in the client's interest but also in the interest of the public. Actuaries are to act in the public interest with "competence, integrity and objectivity of a high order."

120.    The premiums established and charged to the Plaintiffs by Liberty National for Industrial Insurance Policies are and were known by Liberty National to be racially discriminatory, excessive, unfair, unconscionable, unlawful and unreasonable. Liberty National's Industrial Insurance Policies were designed to and have yield a rate of return on these insurance products for Liberty National which is unreasonable.

### III. FRAUDULENT CONCEALMENT CONTINUING
### VIOLATIONS AND EQUITABLE TOLLING

121.    Plaintiffs' claims did not accrue and the statute of limitations did not begin to run until the Plaintiffs knew or reasonably should have known that they were suffering injuries based upon unlawful discrimination. Plaintiffs did not know and did not have reason to know that they were injured or that they were being discriminated against until less than two years prior to the filing of the original complaint in the action. In addition, Plaintiffs' claims have accrued within the limitations period because Liberty National's violations are continuing.

122.    Furthermore, the statute of limitations has not run as to Plaintiffs' claims because the statute of limitations would be suspended due to Liberty National's fraudulent concealment of its discriminatory practices. The statue of limitations would also be tolled under the doctrine of equitable tolling.

123.    When the Plaintiffs purchased their policies, they were told that purchasing a given policy would cost a specified amount. Plaintiffs were not shown rate books. Plaintiffs were not shown anything that would indicate the premiums paid by Caucasian policyholders. Plaintiffs were not told Caucasian policyholders paid lower premiums. Liberty National did not tell the Plaintiffs that different rates existed for Caucasian policyholders. Plaintiffs were not shown any documents which would reveal that Caucasian policyholders paid lesser premiums for the same types of policies. Plaintiffs were told that premiums were based on factors other than race, such as health and age. The logical inference from everything Liberty National told the Plaintiffs were that all policyholders paid the same premiums for the same types of policies.

124.    Plaintiffs were given no information that would have alerted them to Liberty National's discriminatory conduct with respect to premiums, cash values and death benefits, either at the point of sale or in later years. Plaintiffs received no documents reflecting Liberty National discriminatory premiums or other discriminatory practices. The Policies themselves do not reflect that African-Americans were charged higher premiums or that they would receive lower death benefits and cash values than similarly situated Caucasians, nor did they receive annual statements or any other documents which reflected Liberty National's ongoing and knowing discrimination. In fact, although Liberty National's sales agents used rate books reflecting Liberty National's discriminatory practices, the agents were trained to withhold this information from prospective African-American policyholders. Thus, the Liberty National rate books were neither disseminated nor available to the Plaintiffs.

125.    The decisions to sell to African-Americans, to discriminate on the basis of race and to conceal Liberty National's discriminatory practices were made in the early 1940's. Liberty National continues to act in accordance with and in furtherance of its discriminatory practices as set forth more fully herein. Liberty National also continues its practice of fraudulently concealing its discriminatory practices. Throughout this time period, Liberty National has refused to release or provide information about its knowing discrimination against the Plaintiffs in any way the Plaintiffs could have discovered the discrimination. In fact, Liberty National has taken a number of actions to fraudulently conceal its discriminatory practices to insure that these practices were not discovered. Although the initial decisions to discriminate and to conceal were made in the early 1940's, Liberty National has repeatedly made the decision throughout the time period to

continue the concealment of its discriminatory practices and has acted in accordance with this decision.

126.    Liberty National insured that the Plaintiffs could not and would not through the exercise of due diligence, discover Liberty National's unlawful discriminatory conduct due to the undisclosed and indecipherable manner in which Policies were designed and priced by Liberty National.

127.    Beginning in or about 1941, the insurance industry constructed mortality tables which used race as a factor to discriminate against African-Americans, who had been disadvantaged by discriminatory socio-economic conditions.

128.    The insurance industry employed these mortality tables as a pretext to charge higher premiums and to pay comparatively lower cash values and death benefits to African-Americans, as compared to Caucasian policyholders.

129.    These mortality tables were not disseminated or otherwise made available to the Plaintiffs who were disadvantaged by the tables.

130.    The discriminatory mortality assumptions, in turn, were deliberately embedded in the pricing and policy design assumptions by Liberty National and other insurance companies. Nowhere on the face of policy documents provided to the Plaintiffs does *any* information appear which would reveal that the premium charged was based upon racially discriminatory rates.

131.    The unknown and inherently unknowable nature of Liberty National's discriminatory pricing and policy benefit determines was exacerbated by the premium rate structure adopted by Liberty National. The premium rate quoted and charged to any

particular policyholder was dependant on a number of undisclosed rating factors, including, for example, attained age, policy type, and the face amount of coverage.

132.    Thus, as practical reality, it was impossible for the Plaintiffs to compare their effective premium rate with the premiums charged to similarly situated Caucasian policyholders. Consequently, even if Plaintiffs had reason to inquire or investigate, they would not and could not have discovered that that they were sustaining injuries from unlawful, discriminatory conduct by Liberty National. Moreover, as Liberty National is aware the Plaintiffs would not, and did not, learn the rates being charged to Caucasian policyholders were lower for the same amount of insurance.

133.    The same is true with respect to cash values. The inherently undiscoverable nature of Liberty National's discriminatory conduct was further hidden from the Plaintiffs by Liberty National's affirmative efforts to conceal its unlawful conduct through pretextual and misleading premium rates and its other acts of fraudulent concealment, as alleged below.

134.    Liberty National, its affiliates and the companies for which Liberty National is now responsible engaged in a concerted and continuous course of conduct that was intended to fraudulently conceal their unlawful discriminatory practices from the Plaintiffs.

135.    Internally, Liberty National acknowledged its discriminatory policies, classifying African-Americans policyholders charged higher premiums as "Negro" risks as apposed to Caucasian policyholders, who were termed "white" risks. In its dealings with African-Americans, however, Liberty National concocted an elaborate and

pretextual premium rating structure to disguise and conceal from Plaintiffs the fact that they were being charged racially discriminatory premiums.

136.    In the rate books disseminated by Liberty National to its field sales force, the rates for African-Americans were pretextually referred to as "standard" rates, while the rates for Caucasian were referred to as "preferred" rates.

137.    Liberty National trained its agents to sell policies to African-Americans using the more expensive, discriminatory premiums and trained its agents not to disclose to African-American policyholders that the premiums were discriminatory. Liberty National's sales force was trained to tell potential African-American customers, and in fact did tell them on a systematic basis, that they receiving the "standard" rates. The logical inference was that the African-Americans were not being discriminated against. In fact, African-Americans were actually being charged a higher, discriminatory rate.

138.    By design, the Plaintiffs were misled so as to believe that they were paying the same "standard" non-discriminatory rates as Caucasian policyholders. The sales force did not tell the Plaintiffs that the "preferred" rate was for white customers only.

139.    This practice began in the early 1940's and continued at least until the mid-1970's. Liberty National either knew or reasonably should have known that the Plaintiffs would not learn about the discrimination. The nature of society was and is such that the Plaintiffs generally would not learn more favorable rates than were being charged to Caucasians. Liberty National refused to release or provide information about its discrimination against the Plaintiffs in any way that the Plaintiffs could have discovered the discrimination. To this date, Liberty National has refused or failed to correct this

17

conduct, and continue to conceal the information concerning the discrimination from the Plaintiffs.

140.    To maximize its discriminatory sales to African-Americans, Liberty National adopted a distribution system which created economic incentives for its sales agents to prey on the African-American community.

141.    Liberty National sales agents were assigned "debit" routes confined to predominately African-American communities and neighborhoods.

142.    Likewise, Liberty National agents were authorized or encouraged to sell higher priced, poorly performing Industrial Policies to African-Americans and were prevented or discouraged from selling to African-Americans other available products that would provide better benefits for lower premiums.

143.    Liberty National adopted a compensation system which rewarded sales agents economically for discriminatory sales to African-Americans. Liberty National agents were paid commissions based on the premium amount of insurance that they sold. Thus, Liberty National agents profited to the extent they sold higher-priced inferior policies to African-Americans. In the compensation plan for agents who sold its policies, Liberty National created incentives for the agents to disclose only those facts that would encourage sales of insurance. Liberty National itself, like its agents, also benefited from increased sales to African-Americans of higher-priced inferior insurance policies. Disclosure of the fact that the Plaintiffs had been the victims of discrimination would have reduced sales or required Liberty National to lower premiums or provide increased benefits to African-Americans, thereby reducing Liberty National's profits.

18

144.    Therefore, as a result of the sales system and incentives that Liberty National created, the unlawful, racially discriminatory practices outlined herein were intentionally concealed from the Plaintiffs.

145.    Beginning at least in the early 1940s and continuing today or until very recently, Liberty National employed underwriting or rating classifications as a clandestine means to discriminate against African-Americans such as the Plaintiffs. Liberty National developed underwriting criteria which appeared to be racially neutral but which were, in reality, employed as a pretext to continue discrimination against African-Americans. For example, Liberty National specified certain occupations (such as janitors, maids and "bootblacks") that were predominately held by African-Americans and used other underwriting criteria (such as undesirable residential neighborhoods, immoral behavior, or undesirable personal traits) to justify Liberty National's continued practice of charging African-Americans higher premiums for inferior policies. These pretextual standards created the appearance of racially neutral underwriting when, in fact, they were used as tools to continue and conceal Liberty National's discriminatory conduct. Similarly, Liberty National replaced its older Industrial Policies with new products, such as so-called "monthly debit ordinary" or "MDO" polices to continue and to conceal Liberty National's ongoing unlawful discrimination.

146.    Plaintiffs could not reasonably discover the discriminatory premiums and did not do so until within two years before the filing of the lawsuit. Statements or actions undertaken by Liberty National to obscure the claims of the Plaintiffs included training Liberty National's sales agents, directly or indirectly, not to tell the Plaintiffs about Liberty National's discriminatory practices and conduct.

19

147.    The Plaintiffs were misled into believing that they were being charged standard, nondiscriminatory rates, and none of the Plaintiffs learned about the discrimination until less than two years before the filing of this lawsuit. In fact, they did not learn about the discrimination until a very short time before the lawsuit was filed. Therefore, the limitations period has not possibly run on the Plaintiffs. Much of the information about all of the matters pleaded in this section is in the sole possession of Liberty National. Based upon information and belief, the Plaintiffs allege that discovery will lead to more detailed and particular information relating to the matters alleged herein and to Liberty National's practices of fraudulent concealment.

148.    As a practical matter, none of the Plaintiffs could have discovered Liberty National's discriminatory conduct. Since Liberty National began selling to African-Americans, Liberty National instructed its agents not to inform African-American policyholders of these discriminatory rates. Liberty National and its agents knew that disclosing such information would result in the sale of fewer policies to African-Americans. Since Liberty National initially began selling to African-Americans and continuing until the mid-1970s, Liberty National instructed its agents that they were not allowed to sell better policies to African-American customers. One of the ways that Liberty National concealed the discrimination from the Plaintiffs was that Liberty National effectively trained its agents not to share or show full rate books to customers. At most, the agents would show only the rate that was being charged to the person buying the policy, and the rate book said that it was a standard rate, leading the Plaintiffs to believe that they were not being discriminated against. The Plaintiffs allege that this practice continues today. Liberty National further concealed its discriminatory practices

20

by changing the name of its product from Industrial Life to monthly debit ordinary life insurance. In reality, no consumer could or can discover Liberty National's racial discrimination, given the way premiums are set. Absent disclosure by Liberty National or its agents, Plaintiffs could not make such disclosures. Instead, Liberty National actively concealed its discriminatory conduct.

149.    Even with respect to Plaintiffs who have "paid-up" policies, there are "cash values" which Liberty National adjusts each year. Liberty National continues to discriminate against each of these Plaintiffs when it adjusts the cash values of the Policies, including within two years of the filing of the complaint. In fact, the difference in cash values for Policies sold to the Plaintiffs as compared to Policies sold to Caucasian Americans continues to increase each year.

150.    There is a substantial nexus between the acts of discrimination within the two years of filing suit and the acts of discrimination prior to that time. The acts involve the same type of discrimination. The acts are recurring and not isolated.

151.    However, the acts of discrimination did not trigger the awareness of the Plaintiffs to assert their rights, because, among other things, there was no reasonable way for the Plaintiffs to learn that they were being discriminated against, and they did not learn of the discrimination.

152.    All of the aforementioned practices conducted by Liberty National were directed at and affected each individual Plaintiffs in this matter.

153.    Finally, Liberty National is equitable estopped from raising the statute of limitations. The equitable tolling is justified based upon the matters alleged throughout this complaint including the matters set forth above in this section.

154.    Plaintiffs have acted with reasonable prudent regard with respect to their rights. The facts, which support the Plaintiffs cause of action, were not apparent to the Plaintiffs. The practicalities of the situation justify any delay in the filing of the claims in this action.

## IV. FACTUAL ALLEGATIONS

155.    Plaintiffs are African-American who were charged a premium that Liberty National knew to be racially discriminatory on their life insurance Policies, and they were discriminated against as a result of Liberty National's practices alleged above.

156.    Plaintiffs paid their premiums based upon a racially discriminatory premium rate and as a result paid more for her Policy than similarly situated Caucasian individuals would pay.

## COUNT I
## (Race Discrimination 42 U.S.C. §1981)

157.    Plaintiffs repeat, reallege, and incorporate herein by reference the paragraphs above as if fully set forth herein.

158.    Defendant <u>intentionally</u> and <u>purposefully</u> discriminated against Plaintiffs by charging them higher premiums than those charged to similarly situated Caucasian policyholders and by prohibiting or specifically instructing their agents to not offer or sell participatory whole life or other reasonably priced policies or products to African-Americans, depriving Plaintiffs of a fundamental constitutional right.

159.    By charging higher premiums to the Plaintiffs and refusing to offer participatory whole life contracts of insurance or other reasonably priced policies or products to the Plaintiffs, Liberty National violated the rights of Plaintiffs to make and enforce contracts on the same terms as Caucasian policyholders.

22

160.    Defendant's actions violated 42 U.S.C. §1981, as well as the
rights of Plaintiffs under the Fifth, Thirteenth, and Fourteenth Amendments of the
Constitution of the United States.

161.    Defendant has damaged Plaintiffs because Plaintiffs have suffered
economic loss and mental anguish as a result of Liberty National's illegal racial
discrimination. Defendant's acts exhibited oppression, malice, gross negligence, willful
or wanton misconduct and/or reckless disregard for the civil rights of the Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against Liberty National for
compensatory and punitive damages in the amount to be proven at trial for the wrongful
acts complained of, their costs incurred in connection with this action, including
reasonable attorneys' fees and other costs.

### COUNT II
### (Race Discrimination 42 U.S.C. § 1982)

162.    The Plaintiffs repeat, reallege, and incorporate by reference
the paragraphs above as if fully set forth herein.

163.    Life insurance is personal property within the meaning of 42
U.S.C. §1982.

164.    Liberty National has discriminated against Plaintiffs in respect to the life
insurance policies they have purchased and held. Plaintiffs have not had the same right to
purchase and hold the insurance sold by Liberty National. Liberty National has violated
42 U.S.C. § 1982, thus Plaintiffs were deprived of a fundament Constitutional right.

165.    Liberty National's violation of 42 U.S.C. §1982 was <u>intentional</u> and
exhibited oppression, malice, gross negligence, willful or wanton misconduct and/or
reckless disregard for the civil rights of Plaintiffs.

23

166.    Plaintiffs have continued to hold Policies within the time period or periods allowed under the Plaintiffs' claims.

167.    As a proximate result of Liberty National's violation of 42 U.S.C. §1982, Plaintiffs have been damaged.

WHEREFORE, Plaintiffs demand judgment against Liberty National for compensatory and punitive damages in the amount to be proven at trial for the wrongful acts complained of, their costs incurred in connection with this action, including reasonable attorney's fees and other costs.

## COUNT III
### (Breach of Contract)

168.    The Plaintiffs repeat, reallege, and incorporate by reference the paragraphs above.

169.    As a material part of the insurance agreement between Liberty National and Plaintiffs from the inception of certain policies, premium payments were collected by debit agents for Liberty National on a weekly basis.

170.    Beginning in or about 1995 or 1996, Liberty National Life Insurance Company began and continues to unilaterally dismantle and/or alter the established weekly debit collection system which had been the established method of premium collection since inception of certain policies, and thereafter required premium payments to be made directly to Liberty National by Plaintiffs or collected them on a less frequent basis. At the same time, Liberty National continued to demand and collect the same premium paid under the original debit system even though it was no longer providing the same debit collection to the policyholder. In this respect Liberty National collected

24

premium for coverage which was not provided, or in other words, collected unearned premiums.

171.    By dismantling or altering the established debit premium collection system and thereby unilaterally altering the method of premium collection, Liberty National breached a material contractual term of its agreement with the Plaintiffs. As a result of the breach, Plaintiffs suffered economic damage and are entitled to specific performance. By paying premiums directly rather than through the debit procedure contemplated at the time of contracting, Plaintiffs have lost a bargained-for-service with no corresponding decrease in premiums. Plaintiffs have also been forced to incur additional burdens and expenses in making such payments. In addition, Liberty National's discontinuance of the debit collection system resulted in the lapse of numerous policies.

172.    Alternatively, Liberty National has been unjustly enriched by continuing to collect expense loads attributable to the weekly debit collection system, even though that system was dismantled. These premium expense loads exceed the expense of the new, less-costly, premium collection systems. Plaintiffs have suffered an equitable detriment from this wrongful conduct by Liberty National. Therefore, the law implies a debt founded in equity, as it were upon a contract to recover back money, which ought not to be kept by Liberty National as an ill-gotten gain.

WHEREFORE, Plaintiffs demand judgment against Liberty National for compensatory and punitive damages in the amount to be proven at trial for the wrongful acts complained of their costs incurred in connection with this action, including reasonable attorneys' fees and other costs.

_C. 3U_

JERE L. BEASLEY (BEA020)
W. DANIEL "DEE" MILES (MIL060)
C. GIBSON VANCE (VAN025)
Attorneys for Plaintiffs

OF COUNSEL:

BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
272 COMMERCE STREET
POST OFFICE BOX 4160
MONTGOMERY, ALABAMA 36103-4160
(334) 269-2343
(334) 954-7555

## JURY DEMAND

PLAINTIFFS HEREBY DEMAND TRIAL BY JURY ON ALL ISSUES OF THIS CAUSE.

_C. 3U_

OF COUNSEL